**Opinion issued August 9, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-00305-CV

_____

## BACON TOMSONS, LTD., BRL OIL AND GAS, L.L.C., AND FERRELL EDWIN MUNSON, Appellants

## V.

## CHRISJO ENERGY, INC. AND JACK M. CLINE, Appellees

---

**On Appeal from the 122nd District Court**
**Galveston County, Texas**
**Trial Court Case No. 12-CV-0428**

---

## MEMORANDUM OPINION

Appellants, Bacon Tomsons, Ltd., BRL Oil and Gas, L.L.C., and Ferrell

Edwin Munson (collectively "BTL"), sued appellees Chrisjo Energy, Inc. and Jack

M. Cline (collectively "Chrisjo") for various claims, including fraud, conversion,

breach of the Texas Deceptive Trade Practices Act ("DTPA"), and violation of the

Texas Theft Liability Act ("TTLA"), arising out of the parties' investment in a pipeline facility. At trial, BTL nonsuited its DTPA and TTLA claims, and the trial court granted a directed verdict on its remaining claims against Chrisjo, ordering that BTL take nothing on those claims. The trial court then awarded Chrisjo attorney's fees under the TTLA as a "prevailing party." In four issues on appeal, BTL argues that (1) the trial court's plenary power had expired before it entered the order and judgment awarding Chrisjo's attorney's fees; (2) alternatively, Chrisjo was not a "prevailing party" entitled to attorney's fees under the TTLA; (3) alternatively, Chrisjo did not properly segregate its evidence of TTLA attorney's fees; and (4) the trial court erred in concluding that BTL's conversion claim against Chrisjo was barred by the statute of limitations.

We affirm.

## Background

In 2004, Chrisjo entered into an agreement with a third party, Mideast Gas Systems, to develop an existing oil and gas pipeline in Plaquemines Parish, Louisiana, and to construct an additional gas sales pipeline, a saltwater disposal well, and metering stations ("Pipeline Facilities"). The Pipeline Facilities serviced the Coquille Bay Field, which is located offshore along the coast of Louisiana. Mideast retained a 25% interest in the Pipeline Facilities, and Chrisjo obtained a 75% interest in the Pipeline Facilities in exchange for raising $700,000 in capital.

2

BTL invested money through Chrisjo to purchase a portion of Chrisjo's share in the Pipeline Facilities, obtaining an 8.75% ownership interest in the Pipeline Facilities. Chrisjo and BTL memorialized their agreement in a Private Placement Memorandum ("PPM"), which provided that investors would be entitled to collect a proportionate share of the fees paid for the transport of oil and gas through the Pipeline Facilities. Chrisjo recorded an assignment of interest in the Plaquemines Parish property records reflecting the investors' ownership interest in the Pipeline Facilities, including those of BTL. Chrisjo sent its investors, including BTL, payments, statements, and tax documents reflecting the amount earned by each investor based on those fees until 2008, when various problems with operating the pipeline arose.

The investment in the Pipeline Facilities was never very profitable, and the project was plagued by damage to the Coquille Bay Field caused by numerous hurricanes and tropical storms in addition to other problems. In 2010, the operator of the Coquille Bay Field, Imperial Petroleum ("Imperial"), expressed an interest in purchasing the Pipeline Facilities to consolidate the ownership of the various interests in the oil and gas field and to simplify its efforts to comply with certain operating requirements set out by the state of Louisiana. In December 2010, the majority of the investors in the Pipeline Facilities—all of the owners except BTL—transferred their interests in the Pipeline Facilities to Imperial in exchange

for Imperial stock. Imperial made subsequent representations to the Securities and Exchange Commission ("SEC") that this sale gave it a 100% ownership interest in the Pipeline Facilities and then eventually sold all of its interests in the Coquille Bay Field to a third party.

On March 15, 2012, BTL filed suit against Chrisjo, Jack M. Cline, and Imperial Petroleum.[1] BTL alleged causes of action for fraud, negligent misrepresentation, conversion, and breach of fiduciary duty, and it alleged violations of the DTPA, the TTLA, and the Texas Securities Act. BTL argued that Chrisjo misrepresented the nature of the interest conveyed by the PPM and led the investors to believe that they were acquiring a property interest in the oil and gas wells and the production from those wells on the existing lease in the Coquille Bay Field in addition to the Pipeline Facilities. BTL further alleged that Chrisjo then improperly transferred its interest in the Pipeline Facilities to Imperial Petroleum.

Specifically regarding the conversion claim, BTL alleged that "Defendant Imperial has and continues to have wrongfully exercised dominion and control over [BTL's] interest in the Pipeline Facilities" and that "[t]he conversion by Defendants Chrisjo, Cline and/or Imperial is, was and/or continues to be a producing cause of Plaintiffs' actual damages in excess of $140,000."

---

[1] Imperial Petroleum is not a party to this appeal.

4

Chrisjo answered with a general denial and asserted various affirmative defenses, including the defense of limitations. Chrisjo also sought attorney's fees under the TTLA—Civil Practice and Remedies Code section 134.005—in its second amended answer. Chrisjo later moved for leave to file a supplement to its second amended answer seeking to add a claim for attorney's fees under the DTPA. The trial court did not immediately rule on this motion.

In August 2013, Chrisjo moved for summary judgment on the ground that all of BTL's claims against Chrisjo were barred by the applicable statutes of limitations. The trial court denied the motion for summary judgment in October 2013.

The trial court conducted a bench trial on January 20 and 21, 2015. At the start of the trial, the parties agreed on the record to submit the attorney's fees claims to the trial court based on affidavits and briefs at the conclusion of the trial. BTL then nonsuited its TTLA claim, and Chrisjo argued that it was still entitled to attorney's fees. It reminded the trial court that it had sought leave to supplement its pleadings with a claim for attorney's fees under the DTPA, and it believed it was entitled to those fees because "these claims were always groundless from the very beginning." BTL then stated that it was nonsuiting its DTPA claims. The trial court stated that it would "take both issues under advisement" and rule at a later time.

5

Finally, Imperial failed to appear at trial, so BTL requested a post-answer default judgment against Imperial.

At trial, Cline testified that Chrisjo obtained a 75% ownership interest in the Pipeline Facilities in exchange for obtaining the necessary investment money, and Mideast Gas Systems retained a 25% ownership interest in the Pipeline Facilities. Approximately twenty investors, including BTL, invested money in the project. Chrisjo filed an assignment of interests in the property records of Plaquemines Parish reflecting that BTL held an 8.75% ownership interest in the Pipeline Facilities. Cline testified that tropical storms and hurricanes damaged the field on various occasions throughout the relevant time period, halting production for extended periods of time.

Cline testified that on March 6, 2009, he received an email informing him that Imperial, the then-operator of the Coquille Bay Field, was suspending payments of any and all pipeline fees due to problems that had arisen with the Louisiana State Mineral Board Audit Committee. Cline stated that he provided copies of this email to other investors, including BTL, and that he communicated with both Imperial and officials with the state of Louisiana regarding the operation of the Pipeline Facilities, but he was unable to obtain any kind of resolution.

Imperial expressed to Chrisjo and other investors an interest in purchasing the Pipeline Facilities to consolidate the ownership and management of the

Coquille Bay Field and the Pipeline Facilities. Accordingly, Cline testified that Imperial and Chrisjo, along with other owners of the Pipeline Facilities, signed an agreement setting forth the terms of a stock transfer, allowing the owners to trade their interest in the Pipeline Facilities to Imperial in exchange for Imperial stock. This agreement allowed each party to elect to join the transfer or decline.

According to Cline and to the documents admitted at trial, on November 30, 2010, Chrisjo signed an asset purchase agreement ("APA") with Imperial, back-dated to be effective November 1, 2010, giving Chrisjo until December 31, 2010, to send out questionnaires to all of the investors to obtain their consent to convey the 75% interest in the Pipeline Facilities controlled by Chrisjo and its fellow investors, including BTL's 8.75% interest. Cline testified that Chrisjo sent out the necessary information and questionnaires to investors, including BTL. Cline testified that all of the investors, including Chrisjo and Mideast Gas Systems, participated in the sale except for BTL. Regarding the transfer of Chrisjo's and its other investors' interests, Cline testified that they transferred "[s]eventy-five percent minus [BTL's] interest." Cline testified that, as far as he was aware, BTL still owned its interest in the Pipeline Facilities. He also stated that Chrisjo lost money on the Pipeline Facilities deal and never saw a return on its investment.

BTL's attorney asked Cline whether the APA "conveyed" to Imperial a 75% ownership interest in the Pipeline Facilities, which would necessarily have

7

included BTL's interest, and Cline testified that the APA was not "a closing instrument." Under the terms of the APA, the closing was to take place on December 31, 2010. Cline testified that Chrisjo and Imperial designated this closing date because it "gave [Chrisjo] time to try to get the full 75 percent" and that it had a verbal agreement with Imperial that Imperial would consummate the deal even if Chrisjo could not get all of the investors to participate. Cline testified that Chrisjo never represented to Imperial that it had obtained all of the investors' consent to the sale, and Cline stated that he forwarded the questionnaires, including BTL's refusal to join, to Imperial "because [Imperial] had to make SEC filings." Cline also testified that neither he nor Chrisjo ever filed any deed or title documents purporting to transfer BTL's interest in the Pipeline Facilities to any other party.

Cline also testified that, at the time of trial, the SEC was investigating Imperial for wrongdoing and that the president of Imperial had also been indicted. Chrisjo also presented accounting documents demonstrating that the money invested by BTL and other investors was spent in development of the Pipeline Facilities. Chrisjo also adduced evidence demonstrating that it had properly disbursed all transportation fees owing to the owners of the Pipeline Facilities, including BTL.

BTL did not present any documents at trial demonstrating the amount of interest in the Pipeline Facilities actually conveyed at the closing in December 2010 between Chrisjo and Imperial. It did present a document, created by Imperial and filed by Imperial with the SEC, in which Imperial claimed to have acquired from Chrisjo its investors' full 75% ownership in the Pipeline Facilities. This SEC filing also contained some representations from a press release made by Imperial that Imperial had sold its interest in the Coquille Bay Field, including the Pipeline Facilities, to a third party.

Tom Elkins testified on behalf of Bacon Tomsons, Ltd. He testified that Bacon Tomsons had invested $70,000 in the Pipeline Facilities and had received less than $7,000 in return. Elkins testified that "early on" he understood that the deal was to obtain an interest in the pipeline and did not include income from the oil and gas production. Elkins testified that Bacon Tomsons did not receive any distributions for transportation fees after 2008, and he did not know why the distributions stopped. BTL presented evidence that the Coquille Bay Field had produced oil and gas after that time, but Elkins also testified that he understood that since 2009, "they barge it out of there rather than use[] a pipeline." Elkins agreed that Bacon Tomsons was not entitled to any transportation fees under its interest in the Pipeline Facilities unless the pipeline was used to move the oil.

9

Regarding the sale of the Pipeline Facilities to Imperial, Elkins testified that Bacon Tomsons received the information and questionnaire from Chrisjo and elected not to participate in the sale. Elkins further testified that the third party purchaser of the Coquille Bay Field eventually recognized Bacon Tomsons' ownership interest in the Pipeline Facilities and contacted Elkins regarding "litigation pending on the ownership of the pipeline that he had purchased from Imperial. And he knew that I was one of the—or Bacon Tomsons was one of the owners."

Regarding the ownership of the Pipeline Facilities at the time of trial, Elkins testified: "I'm not sure what's happened. I think they've swapped and traded and moved and shoved and diluted and—until nobody knows what's going on anymore." Elkins testified that he understood the assignment of interest reflecting Bacon Tomsons' ownership interest in the Pipeline Facilities had been filed in the Plaquemines Parish property records, that he had not examined the real property records to determine whether any subsequent assignment had been filed transferring Bacon Tomsons' interest to someone else, and that he had not hired a landman or title company to perform a title search or otherwise give an opinion about who owned the Pipeline Facilities as of the time of trial.

Larry Porter testified as a representative of BRL Oil and Gas. BRL invested $17,500 in the Pipeline Facilities after hearing of the opportunity from Elkins.

Porter testified that BRL received distributions of fee revenue from Chrisjo through 2008, but that the total amount of money generated from the investment was small—approximately $1,650. Porter also acknowledged that he would not be entitled to transportation fees for any oil and gas produced from the Coquille Bay Field unless it was moved through the pipeline. He testified that, at the time BRL entered into the deal with Chrisjo, he did not consider the possibility that a barge could be used to transport the oil and gas produced in the field.

BRL, like Bacon Tomsons, knew of Imperial's proposed purchase of the Pipeline Facilities and had elected not to participate. Porter testified that, as of November 2011, he still believed BRL owned an interest in the pipeline. Porter testified that at the time of trial he was not sure whether BRL owned an interest in the Pipeline Facilities, but he could not affirmatively state that BRL did not own it. Porter had no contact with the third-party purchaser of Imperial's interest in the Pipeline Facilities and only learned of Imperial's representations that it owned and subsequently sold a 100% ownership interest in the Pipeline Facilities as a result of the underlying litigation. Porter testified that he had not performed a title search or otherwise examined the property records in Plaquemines Parish to determine the current ownership of the Pipeline Facilities because there was no oil or gas coming through the pipeline so it was not worth the money to investigate.

11

Ferrell Munson also testified at trial. Munson personally invested $35,000 in the Pipeline Facilities and received approximately $3,163.69 in return on his investment. Munson testified at trial that he did not currently own an interest in the Pipeline Facilities because "Mr. Cline sold it." Munson based his belief that Chrisjo sold his ownership interest in the Pipeline Facilities on the language in the APA indicating that Chrisjo was transferring to Imperial a 75% ownership interest in the Pipeline Facilities, which would necessarily have included Munson's interest. However, Munson had no personal knowledge regarding whether Imperial's purchase of the Pipeline Facilities finally closed under the terms of the APA. Like Elkins and Porter, Munson never checked the property records in Plaquemines Parish to identify the record owners of the Pipeline Facilities at the time of trial. Munson did not know whether any oil or gas was being transported through the pipeline at the time of trial.

Chrisjo moved for a directed verdict on BTL's claims. The trial court did not rule on the motion for directed verdict at that time. Chrisjo then presented its own case, including the testimony of expert witness Charles Fife, who testified regarding the nature of the transactions between Chrisjo and its investors and between Chrisjo and Imperial.

At the close of trial on January 21, 2015, Chrisjo renewed its motion for directed verdict and filed a bench brief on limitations, stating that it sought a

directed verdict on the basis that all of BTL's claims against it were barred by the respective statutes of limitations. Regarding BTL's conversion claim, Chrisjo argued that BTL's claim had accrued in 2004 when the investors entered into the PPM, and thus the two-year limitations period had run well in advance of BTL's filing suit in 2012. Regarding the claim of conversion arising out of the 2010 transfer of its interest in the Pipeline Facilities to Imperial, Chrisjo argued in its supplemental bench brief on its motion for directed verdict that

> the parties involved in this transaction [Imperial and Chrisjo] understood that Chrisjo did not yet own 75% of the Pipeline, but was going to attempt to acquire the interest in the next 30 days. This fact is clearly evidenced by the closing date in the Purchase Agreement. Id. at § 1.01. Defendants' expert, Charles Fife, testified this is common in the oil and gas industry so that the seller can lock the buyer into a fixed price for the maximum interest that is desired to be sold. When the entire interest is not acquired (as in this case), the closing is modified or does not happen. Defendants testified that is what happened here.

Furthermore, Chrisjo argued that any misrepresentations in the APA were made by it to Imperial, not to BTL. And Chrisjo argued that neither the 2010 APA nor the 2012 SEC filing supported BTL's claim for conversion against Chrisjo because

> [Cline] testified that Chrisjo and Imperial never closed on the sale of [BTL's] interest and that [its] interests were never sold. Whether Imperial (who is currently under investigation by the SEC for making fraudulent statements) misrepresented to the SEC that it owned the Coquille Pipeline or not, that alleged misrepresentation did not transfer title away from [BTL]. Indeed, [BTL] remain[s] the current owners of record as nothing has ever been filed in the deed records

transferring [BTL's] interest to any other party. [BTL] admit[s] that [it has] never performed a title search . . . and [does] not know whether [it] still own[s] [its] interest in the Pipeline.

On February 11, 2015, Chrisjo filed its post-trial brief in support of its request for a mandatory award of attorney's fees in the amount of $52,353.95. It argued that it was a prevailing party because BTL nonsuited claims, including its DTPA and TTLA claims, to avoid an unfavorable ruling on the merits. Chrisjo also attached evidence supporting its claim for attorney's fees, including affidavits regarding attorney's fees, billing statements, and excerpts from the depositions of Ferrell Munson, Thomas Elkins in his capacity as a representative for Bacon Tomsons, and J. Larry Porter in his capacity as a representative for BRL Oil and Gas.

In an affidavit attached as evidence to Chrisjo's brief seeking attorney's fees, Chrisjo's attorney averred that the $52,353.95 amount represented fees expended in defending against BTL's claims for breach of the DTPA and TTLA. He stated that, "[t]o the extent possible, [Chrisjo has] properly segregated recoverable from non-recoverable fees." He further averred that all of the claims—including those for violation of the TTLA and DTPA, conversion, and fraud—all involved the same operative facts and shared common elements, stating,

> As such, those discrete legal services that advance both recoverable and non-recoverable claims are so intertwined that they cannot be segregated. Similarly, to the extent services were rendered that were necessary for all claims (e.g., requests for disclosures, proof of facts,

depositions of primary actors, and motions for summary judgment), those services have been properly included as they are not disallowed simply because they do double service.

The billing statements attached as evidence supporting Chrisjo's claim for attorney's fees included itemized billing showing the initials of the person performing a particular service, a brief description of the service, the time spent, the hourly rate, and the amount billed. These bills were redacted to protect confidential information, and they also reflected that Chrisjo had deleted numerous discrete legal services that, according to the attorney's affidavit, were not applicable to the recoverable claims. Chrisjo did not present any evidence of the total amount of attorney's fees it incurred in defending against BTL's suit.

On February 24, 2015, the trial court signed a post-answer default judgment awarding BTL damages from Imperial.

On March 4, 2015, the trial court denied Chrisjo leave to file its supplement to its second amended answer—the pleading which sought to add a claim for attorney's fees under the DTPA. The trial court ordered the supplemental answer stricken, leaving Chrisjo's claim for attorney's fees under the TTLA as its only claim for attorney's fees.

Also on March 4, 2015, the trial court signed its "Order Granting [Chrisjo's] Motion for Directed Verdict." It stated,

> It appears to the Court, having considered all the evidence and subsequent briefing in the case, and the reasonable inferences flowing

from it, in the light most favorable to [BTL], that the evidence is insufficient as a matter of law to entitle [BTL] to recover against [Chrisjo], and the Court is of the opinion that judgment should be rendered in favor of [Chrisjo] as a matter of law.

It ordered that BTL "take nothing by this action" against Chrisjo. This order did not address Chrisjo's claims for attorney's fees under the TTLA, and it did not purport to be a final judgment.

On March 18, 2015, Chrisjo moved for entry of an award of attorney's fees and for entry of final judgment in light of the order on its motion for directed verdict. The trial court held a hearing on that motion, in which BTL argued that no further rulings were necessary because the March 4 order disposed of all remaining issues.

On July 8, 2015, the trial court signed an order awarding attorney's fees to Chrisjo in the amount of $24,829.42 based on its finding that Chrisjo was a prevailing party under the TTLA because BTL "nonsuited [its] Theft Act claims to avoid an unfavorable ruling on the merits." The trial court also awarded conditional attorney's fees in the event of a subsequent appeal.

Also on July 8, 2015, Chrisjo filed an amended motion for entry of final judgment, and the trial court set a hearing to occur on August 5, 2015. On August 5, 2015, BTL filed objections and a response to Chrisjo's motion for entry of a final judgment again arguing, in part, that the March 4 order disposed of all pending claims.

On August 7, 2015, the trial court signed its final judgment, incorporating the post-answer default judgment against Imperial, the order granting a directed verdict in favor of Chrisjo, and its ruling on Chrisjo's claim for attorney's fees under the TTLA.

On August 11, 2015, BTL requested that the trial court file findings of fact and conclusions of law, which the trial court never signed.

This appeal followed. BTL does not challenge the trial court's ruling on any of its causes of action except for its conversion claim against Chrisjo. BTL also challenges the trial court's award of attorney's fees to Chrisjo as a prevailing party under the TTLA.

## Directed Verdict on Conversion Claim

In its fourth issue, BTL argues that the trial court erred in ruling that its conversion claim was barred by limitations. We construe this as a complaint that the trial court erred in granting Chrisjo's motion for directed verdict on BTL's conversion claim.

## A.    Standard of Review

We review directed verdicts under the same legal-sufficiency standard that applies to no-evidence summary judgments. *City of Keller v. Wilson*, 168 S.W.3d 802, 823–24 (Tex. 2005); *see Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013) (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750 (Tex.

2003)). We sustain a legal-sufficiency point when (1) there is a complete absence of evidence regarding a vital fact, (2) rules of law or evidence preclude giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Wilson*, 168 S.W.3d at 810. We consider the evidence in the light most favorable to the nonmovant, crediting evidence a reasonable jury could credit and disregarding contrary evidence and inferences unless a reasonable jury could not. *Id.* at 826. The nonmovant bears the burden to identify evidence before the trial court that raises a genuine issue of material fact as to each challenged element of its cause of action. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 206–07 (Tex. 2002).

A directed verdict is proper if a party "fails to present evidence raising a fact issue essential to [its] right of recovery," or if the party "admits or the evidence conclusively establishes a defense to [its] cause of action." *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). We may affirm a directed verdict on any ground that supports it. *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 443 (Tex. App.—Dallas 2002, pet. denied). However, if there is evidence that raises a material fact issue on any theory of recovery, a directed verdict is improper and the case must be reversed and remanded. *See Cox v. S. Garrett, L.L.C.*, 245 S.W.3d 574, 578 (Tex. App.—Houston [1st Dist.] 2007, no

18

pet.) (citing *Szczepanik v. First S. Tr. Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (per curiam)).

Conversion is the unauthorized and unlawful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights. *Freezia v. IS Storage Venture, LLC*, 474 S.W.3d 379, 386 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex. 1971)). The elements of a conversion cause of action are that: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; (3) the plaintiff made a demand for the property; and (4) the defendant refused to return the property. *Freezia*, 474 S.W.3d at 386–87; *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 888 (Tex. App.—Dallas 2009, no pet.). A plaintiff can recover for the conversion of personal property such as rental income. *See Freezia*, 474 S.W.3d at 387 (citing *Hoenig v. Tex. Commerce Bank, N.A.*, 939 S.W.2d 656, 664 (Tex. App.—San Antonio 1996, no writ)) (holding that plaintiff can recover for conversion of rental income); *see also Hernandez v. Sovereign Cherokee Nation Tejas*, 343 S.W.3d 162, 175 (Tex. App.—Dallas 2011, pet. denied) ("[A]n action will lie for conversion of money when its identification is

possible and there is an obligation to deliver the specific money in question or otherwise particularly treat specific money.") (quoting *Houston Nat'l Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.)). However, Texas does not recognize conversion claims for real property. *See Freezia*, 474 S.W.3d at 386 (stating that conversion involves unlawful exercise of control over personal property); *Lucio v. John G. & Marie Stella Kennedy Mem'l Found.*, 298 S.W.3d 663, 672 (Tex. App.—Corpus Christi 2009, pet. denied) (observing that Texas law does not recognize cause of action for conversion of real property).

## B. Analysis

Although Chrisjo stated that its motion for directed verdict was based on arguments that all of BTL's claims were barred by the applicable statute of limitations, its motion also addressed the sufficiency of BTL's evidence on its conversion claim. It is unclear from BTL's pleadings and evidence at trial whether its conversion claim was based on an alleged conversion of BTL's money invested in the Pipeline Facilities, conversion of BTL's ownership interest in the Pipeline Facilities, or conversion of the transportation fees that owners of the Pipeline Facilities were entitled to collect. Assuming without deciding that these property interests are property that can be converted, we agree with Chrisjo that BTL failed to provide any evidence of conversion.

Chrisjo argued that the only evidence presented by BTL to support the conversion claim is insufficient because it did not demonstrate that BTL's property was ever actually transferred to Imperial or that Chrisjo otherwise assumed and exercised dominion and control over the property in an unlawful and unauthorized manner. Chrisjo also argued that BTL failed to provide any evidence, in the form of a title search or other investigation of the real property records, identifying the record owners of the Pipeline Facilities at the time of trial. The trial court granted the motion for directed verdict, stating that it had considered all of the evidence and briefing in the case and that it had determined "that the evidence is insufficient as a matter of law."

At trial, BTL presented no evidence that Chrisjo had assumed and exercised dominion and control over the money invested in the Pipeline Facilities, its interest in the Pipeline Facilities, or the transportation fees owing to it as owners of the Pipeline Facilities in an unlawful and unauthorized manner, to the exclusion of and inconsistent with BTL's rights. *See Alan Reuber Chevrolet*, 287 S.W.3d at 888 (setting out elements of conversion). BTL presented no evidence that the money it invested in the Pipeline Facilities was misused, and it provided no evidence rebutting Chrisjo's evidence accounting for all of the funds that were invested in the project. In fact, BTL representatives testified that, as far as they were aware, they still owned an interest in the Pipeline Facilities at the time of trial, and they

acknowledged that they never performed a title search or other examination of the real property records to determine whether their ownership interest had ever been transferred to Imperial. Elkins, Porter, and Munson each testified that they were aware at or near the time of their 2004 investment that they were receiving only an interest in the Pipeline Facilities; that they in fact received the only disbursements of fees that they were entitled to under the terms of their assignment of interests; and that, as far as they were aware, they still remained the record owners of their interest in the Pipeline Facilities even though the Coquille Bay Field operators had ceased using the pipeline in 2008. Elkins, Porter, and Munson all testified that they received disbursements of transportation fees through 2008. Elkins testified that he was aware that, after 2008, the Coquille Bay Field operator had been using barges rather than the pipeline to move the oil and gas, and he agreed that the owners of the Pipeline Facilities were not entitled to transportation fees unless the operator used the pipeline.

Although the 2010 APA states that Chrisjo offered Imperial a 75% ownership interest in the Pipeline Facilities, this document was not a title instrument and did not serve to actually transfer any rights to the Pipeline Facilities, and thus, necessarily, Chrisjo did not misappropriate any funds or fees related to the Pipeline Facilities. The agreements between Chrisjo and Imperial allowed for each investor to consider the terms of the offer and elect whether it

wanted to participate in the transaction. Cline testified that when BTL refused to participate in the sale, under the terms of the APA the remaining owners transferred their interests in the Pipeline Facilities and left BTL's interests undisturbed. Cline stated that Chrisjo never filed any documents transferring BTL's interest in the Pipeline Facilities. BTL presented no evidence contradicting this testimony, nor did it present any evidence establishing that Chrisjo actually transferred its ownership interest. Furthermore, any representations by Imperial in its SEC filing that it owned a 100% ownership interest in the Pipeline Facilities are irrelevant to BTL's conversion claim against Chrisjo. Because BTL failed to present any evidence raising a fact issue regarding whether Chrisjo had assumed and exercised dominion and control over any personal property of BTL's in an unlawful and unauthorized manner, to the exclusion of and inconsistent with BTL's rights, the trial court's directed verdict on the conversion claim was proper. *See Prudential Ins. Co.*, 29 S.W.3d at 77; *see also Exxon Corp.*, 82 S.W.3d at 443 (holding that we may affirm directed verdict on any ground that supports it).

We overrule BTL's fourth issue on appeal.

### Jurisdiction of Trial Court to Enter August 7, 2015 Judgment

In its first issue, BTL argues that the trial court lacked jurisdiction to render its July 8, 2015 order awarding attorney's fees to Chrisjo and its August 7, 2015 final judgment because its plenary power had expired. BTL argues that the trial

23

court's March 4, 2015 order granting Chrisjo's motion for directed verdict was "presumed final despite the pending request for attorneys' fees as sanctions made in [Chrisjo's] post-trial brief filed before the judgment was signed."

## A. Legal Standard

There can be only one final judgment in this cause. *See* TEX. R. CIV. P. 301. Generally, a judgment is final when it "actually disposes of all claims and parties then before the court, regardless of its language, or it states with unmistakable clarity that it is a final judgment as to all claims and all parties." *Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 192–93 (Tex. 2001). An appellate court determines the finality of a judgment by the language of the judgment. *Id.* at 199.

In the absence of a contrary showing in the record, a judgment rendered after a conventional trial on the merits carries a presumption of finality. *See Houston Health Clubs, Inc. v. First Court of Appeals*, 722 S.W.2d 692, 693 (Tex. 1986) (orig. proceeding); *N. E. Indep. Sch. Dist. v. Aldridge*, 400 S.W.2d 893, 897–98 (Tex. 1966) ("When a judgment, not intrinsically interlocutory in character, is rendered and entered in a case regularly set for a conventional trial on the merits, no order for a separate trial of issues having been entered . . . it will be presumed for appeal purposes that the Court intended to, and did, dispose of all parties legally before it and of all issues made by the pleadings between such parties."). Otherwise, no such presumption arises. *Lehmann*, 39 S.W.3d at 199–200; *see also*

24

*Aldridge*, 400 S.W.2d at 898 (concluding, "in the absence of a contrary showing in the record," that judgment entered after case was set for conventional trial on the merits was presumed final for purposes of appeal); *Exxon Corp. v. Garza*, 981 S.W.2d 415, 419 (Tex. App.—San Antonio 1998, pet. denied) (stating that presumption of finality recognized in *Aldridge* "only applies . . . in the absence of a contrary showing in the record"). "If there is any doubt as to the judgment's finality, then finality must be resolved by a determination of the intention of the court as gathered from the language of the decree and the record as a whole, aided on occasion by the conduct of the parties." *Vaughn v. Drennon*, 324 S.W.3d 560, 563 (Tex. 2010) (per curiam) (quoting *Lehmann*, 39 S.W.3d at 203) (internal quotation marks, bracketing, and capitalization omitted).

BTL argues, in part, that its nonsuit of its TTLA claim against Chrisjo resolved Chrisjo's related claim for attorney's fees under the TTLA. Texas Rule of Civil Procedure 162 provides:

> At any time before the plaintiff has introduced all of his evidence other than rebuttal evidence, the plaintiff may dismiss a case, or take a non-suit, which shall be entered in the minutes. . . .
> Any dismissal pursuant to this rule shall not prejudice the right of an adverse party to be heard on a pending claim for affirmative relief or excuse the payment of all costs taxed by the clerk. A dismissal under this rule shall have no effect on any motion for sanctions, attorney's fees or other costs, pending at the time of dismissal, as determined by the court.

TEX. R. CIV. P. 162. A plaintiff's decision about which of its claims to pursue or abandon does not control the fate of a nonmoving party's independent claims for affirmative relief. *Villafani v. Trejo*, 251 S.W.3d 466, 469 (Tex. 2008); *Alan Reuber Chevrolet*, 287 S.W.3d at 887. Specifically, a plaintiff's nonsuit cannot extinguish a defendant's counterclaim for costs and attorney's fees. *Villafani*, 251 S.W.3d at 469; *Alan Reuber Chevrolet*, 287 S.W.3d at 887; *see also Referente v. City View Courtyard, L.P.*, 477 S.W.3d 882, 886 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (holding that nonsuit "has no effect on any motion for attorney's fees or other costs pending at the time of dismissal"); *Dean Foods Co. v. Anderson*, 178 S.W.3d 449, 453 (Tex. App.—Amarillo 2005, pet. denied) ("A request for attorney's fees is a claim for affirmative relief.").

## B. Analysis

Here, Chrisjo's request for attorney's fees was not, as BTL suggests, based on a motion for sanctions. BTL pleaded a cause of action for violations of the TTLA, and Chrisjo filed an answer denying the claim and asserting a claim for attorney's fees pursuant to the TTLA. On the day of trial, prior to presenting its case-in-chief, BTL nonsuited its TTLA claim, and Chrisjo argued at trial and in a post-trial motion and briefing that it was entitled to "prevailing party" attorney's fees because BTL had nonsuited the TTLA claim to avoid an unfavorable ruling on the merits. At the beginning and close of evidence at trial, the parties agreed on the

record that they would submit evidence and briefing on the issue of attorney's fees to the trial court post-trial. Thus, at the time BTL non-suited its TTLA claim, Chrisjo had a pending claim for attorney's fees. *See Villafani*, 251 S.W.3d at 469.

BTL argues that Chrisjo's pending "request for sanctions" was not a claim for affirmative relief that was independent of BTL's nonsuited claim; however, Texas courts have held that "[a]n affirmative claim, stated in an answer, for recovery of attorney's fees for preparation and prosecution of a defense constitutes a counterclaim." *In re C.A.S.*, 128 S.W.3d 681, 686 (Tex. App.—Dallas 2003, no pet.); *In re Frost Nat'l Bank*, 103 S.W.3d 647, 650 (Tex. App.—Corpus Christi 2003, no pet.); *see also Villafani*, 251 S.W.3d at 469 (holding that "a plaintiff's nonsuit cannot extinguish a defendant's counterclaim for costs and attorney's fees"); *Nolte v. Flournoy*, 348 S.W.3d 262, 267 (Tex. App.—Texarkana 2011, pet. denied) (claim for attorney's fees included in defendant's answer was considered to be counterclaim seeking affirmative relief). A defendant's claim for attorney's fees under the TTLA is one that can survive past the resolution of the plaintiff's claim. *See, e.g.*, *Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011) (stating that "prevailing party" may include defendant who successfully defends against claim and that defendant may still be "prevailing party" after plaintiff's nonsuit under some circumstances); *Arrow Marble, LLC v. Estate of Killion*, 441 S.W.3d 702, 706 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (recognizing that "[c]ourts

27

have held that the phrase 'prevailing party' in section 134.005(b) of the TTLA includes both a plaintiff successfully prosecuting a theft suit and a defendant successfully defending against one" and analyzing effect of dismissal of plaintiff's claim on defendant's status as "prevailing party"). We conclude that Chrisjo's claim for attorney's fees here was a claim for affirmative relief that was not disturbed by BTL's nonsuit.

BTL also argues that even if the request for attorney's fees was an independent claim for affirmative relief, the March 4 order was still final under the *Aldridge* presumption. *See Aldridge*, 400 S.W.2d at 898 (holding that judgments rendered after conventional trial on merits carry presumption of finality). However, the record here rebuts any presumption of finality. *See, e.g.*, *Vaughn*, 324 S.W.3d at 563 (stating that presumption of finality applies "unless a trial court orders a separate trial to resolve a specific issue"); *Aldridge*, 400 S.W.2d at 898 (presuming judgment following setting for trial on merits is final "in the absence of a contrary showing in the record").

The trial court's March 4 order does not purport to be a judgment—much less a final judgment—and it does not contain any language demonstrating that it was intended to be final: it does not state that it is a final judgment or intended to be appealable; it does not incorporate the trial court's previous post-answer default judgment against Imperial Petroleum; and it does not contain a "Mother Hubbard"

28

clause disposing of claims not specifically mentioned. Rather, the March 4 order is styled as an "Order Granting Defendant's Motion for Directed Verdict," and the language of the order granted Chrisjo's motion for directed verdict and disposed only of the issues addressed in that motion. It does not address or dispose of Chrisjo's pending claim for attorney's fees or award costs. Accordingly, it was not final. *See Epps*, 351 S.W.3d at 868 (holding that nonsuit does not affect any pending claim for affirmative relief or motion for attorney's fees or sanctions); *Lehmann*, 39 S.W.3d at 192–93 (holding that judgment is final for purposes of appeal "if and only if either it . . . actually disposes of all claims and parties then before the court, regardless of its language, or it states with unmistakable clarity that it is a final judgment as to all claims and all parties").[2] The trial court continued to accept briefing from the parties and enter orders until it rendered its August 7, 2015 judgment, entitled "Final Judgment," that incorporated all of its previous rulings and finally disposed of all of the claims of all of the parties.

We conclude that the March 4 order was not a final judgment. That order granted Chrisjo's motion for a directed verdict, but did not address the pending

---

[2]     BTL also argues that any agreement by the parties to try attorney's fees after March 4, 2015 could not extend the trial court's jurisdiction beyond the limits provided by Rule of Civil Procedure 329b and that Chrisjo's post-judgment motions would not have extended the trial court's plenary power to encompass the July 8, 2015 order awarding attorney's fees and the August 7, 2015 final judgment. Because we conclude that the March 4, 2015 order was not final and that the final judgment was rendered on August 7, 2015, when the trial court finally disposed of all claims and all parties, we need not address these contentions.

claim for attorney's fees. The trial court rendered its final judgment on August 7, 2015, as that was a judgment that finally disposed of all claims and parties. Accordingly, the trial court retained jurisdiction to render its order granting attorney's fees and its August 7 judgment.

We overrule BTL's first issue.

**Award of Attorney's Fees**

In its second and third issues, BTL argues that the trial court erred in awarding Chrisjo attorney's fees under the TTLA.

**A. Standard of Review**

The availability of attorney's fees under a particular statute is a question of law that we review de novo. *Arrow Marble*, 441 S.W.3d at 705. TTLA section 134.005(b) provides that "[e]ach person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees." TEX. CIV. PRAC. & REM. CODE ANN. § 134.005(b) (West Supp. 2015); *Arrow Marble*, 441 S.W.3d at 705. The award of fees to a prevailing party in a TTLA action is mandatory. *Arrow Marble*, 441 S.W.3d at 705 (citing *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998)). Although the TTLA does not define the phrase "prevailing party," Texas courts, including this Court, have held that both a plaintiff successfully prosecuting a theft suit and a defendant successfully defending against one can be considered prevailing parties under the TTLA. *Arrow*

30

*Marble*, 441 S.W.3d at 706; *see Epps*, 351 S.W.3d at 866–70 (construing written contract to give meaning to term "prevailed" and setting out circumstances under which defendant may be considered to have prevailed).

A defendant is generally not a prevailing party when the plaintiff nonsuits its claims without prejudice. *Epps*, 351 S.W.3d at 869; *BBP Sub I LP v. DiTucci*, No. 05-12-01523-CV, 2014 WL 3743669, at *3 (Tex. App.—Dallas July 29, 2014, no pet.) (mem. op.) (applying reasoning in *Epps* to claim for attorney's fees under TTLA). However, the supreme court in *Epps* looked with disfavor upon "nonsuits that are filed to circumvent unfavorable legal restrictions or rulings" and held that "a defendant may be a prevailing party when a plaintiff nonsuits without prejudice if the trial court determines, on the defendant's motion, that the nonsuit was taken to avoid an unfavorable ruling on the merits." 351 S.W.3d at 870; *Referente*, 477 S.W.3d at 886; *DiTucci*, 2014 WL 3743669, at *3.

Courts make the determination of whether a plaintiff nonsuited in order to avoid an unfavorable ruling "based upon inferences drawn from the course of events in the lawsuit." *Epps*, 351 S.W.3d at 870 ("[C]ourts should rely as far as possible on the existing record and affidavits, and resort to live testimony only in rare instances."). "A number of factors may support an inference that a plaintiff has nonsuited in order to avoid an unfavorable ruling," including the timing of the nonsuit, the plaintiff's unexcused failure to obtain discovery of evidence that might

disprove its claim, or the existence of other procedural obstacles, such as the inability to join necessary parties. *Id.* at 870–71; *Referente*, 477 S.W.3d at 886. The supreme court also stated:

> On the other hand, as we have noted, it is reasonable to presume that the parties did not intend to encourage continued litigation when discovery reveals previously unknown flaws in the plaintiff's claims. Accordingly, evidence that the suit was not without merit when filed may indicate that the defendant has not prevailed and is therefore not entitled to attorney's fees.

*Epps*, 351 S.W.3d at 871.

"[W]hether a party nonsuited to avoid an unfavorable ruling is a question of fact," and "the trial court's finding on that issue may be challenged on the ground that it is not supported by sufficient evidence." *Referente*, 477 S.W.3d at 885. "Accordingly, we will review the trial court's determination under *Epps* for an abuse of discretion, deferring to factual findings that are supported by some evidence, but reviewing legal questions de novo." *Id.* at 886.

## B.    Prevailing Party

In its second issue, BTL argues that the trial court erred in awarding Chrisjo attorney's fees because Chrisjo was not a prevailing party under the TTLA. Specifically, it argues that it nonsuited its TTLA claim without prejudice and that the evidence was legally and factually insufficient to establish that it nonsuited to avoid an unfavorable ruling on the merits. Chrisjo argues that the timing of the

32

nonsuit and the evidence adduced at trial support a conclusion that BTL nonsuited its TTLA claim to avoid an unfavorable ruling on the merits.

Here, the trial court found that BTL took the nonsuit to avoid an unfavorable ruling on the merits. The record indicates that BTL filed its TTLA claim in March 2012 and nonsuited it at trial in January 2015, thereby requiring Chrisjo to expend effort and attorney's fees in defending against that claim for nearly three years. BTL took its nonsuit on the day the bench trial began, but it did not nonsuit its related claim for conversion, which does not allow for the recovery of attorney's fees. When Chrisjo reminded the trial court that it still had pending claims for attorney's fees under the DTPA as well, BTL nonsuited its DTPA claim, but did not nonsuit its related fraud claims, which did not allow for the recovery of attorney's fees. BTL provided no explanation for its decision to nonsuit the TTLA and DTPA claims but not the related conversion and fraud claims.

Furthermore, the evidence at trial demonstrated that BTL failed to procure evidence that would have demonstrated whether Chrisjo misused or misappropriated any funds or other property interests. The TTLA "permits a civil cause of action for damages against a party who commits theft via any of the numerous methods defined under the Texas Penal Code." *Cluck v. Mecom*, 401 S.W.3d 110, 117 (Tex. App.—Houston [14th Dist.] 2011, pet. denied); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 134.003 ("A person who commits theft is liable

33

for the damages resulting from the theft."); *id.* § 134.002(2) (defining "theft" as unlawful appropriation of property or unlawfully obtaining services as defined in Texas Penal Code chapter 31).

As with BTL's claim for conversion, neither the pleadings nor the evidence clearly states whether BTL's theft claim was based on Chrisjo's alleged theft of BTL's money invested in the Pipeline Facilities, theft of the transportation fees, or theft of some other interest in the Pipeline Facilities. Assuming, without deciding, that these complaints can properly form the basis of a TTLA claim, BTL failed to obtain any of the evidence necessary to support its claim that Chrisjo committed theft of BTL's funds or other interest in the Pipeline Facilities. According to Cline's testimony and other evidence adduced by Chrisjo, the money invested by BTL was used according to its agreed purpose in developing the Pipeline Facilities and Chrisjo properly recorded BTL's interest in the Pipeline Facilities in the Plaquemines Parish property records. Chrisjo also presented evidence that all transportation fees were properly dispersed and that no documents that transferred BTL's interest in the Pipeline Facilities were ever executed or recorded. BTL offered no explanation for this failure to obtain actual proof of the ownership of the Pipeline Facilities, other than Munson's testimony that he did not believe hiring a title company was worth the money. None of the BTL representatives explained why they were unable to review the property records themselves. Thus, the record

contains evidence of BTL's unexcused failure to complete discovery of evidence that could support entry of an adverse judgment—i.e., evidence from the property records demonstrating that BTL still owned property that was the subject of its theft claim. *See Epps*, 351 S.W.3d at 871. Accordingly, the timing of the nonsuit and other inferences drawn from the course of events in the lawsuit support the trial court's finding. *See id.* at 870.

BTL also argues that Chrisjo failed to establish that the TTLA claim was meritless when filed and, thus, did not establish that BTL nonsuited to avoid an unfavorable ruling on the merits. BTL relies on the fact that its claim survived Chrisjo's motion for summary judgment on limitations grounds. However, BTL's argument that its TTLA claim was not time barred is not the equivalent of evidence that its suit was "not without merit when filed" but was subsequently revealed to have unknown flaws. *See id.* at 871. BTL presented no evidence or argument demonstrating that it conducted appropriate discovery of the TTLA claim that revealed flaws in its suit. On the contrary, the evidence in the record demonstrates that BTL's TTLA claim against Chrisjo was meritless and that BTL had in its possession—prior to its filing of suit—the information it needed to determine that Chrisjo did not commit theft.

BTL asserted that Chrisjo committed civil theft or conversion by misusing its investment in the Pipeline Facilities and by selling its interest in the Pipeline

35

Facilities to Imperial, but BTL presented no evidence that such misuse or improper sale ever occurred. Elkins, Porter, and Munson each testified that they were aware at or near the time of their 2004 investment that they were receiving only an interest in the Pipeline Facilities; that they in fact received the only disbursements of fees that they were entitled to under the terms of their assignment of interests; and that, as far as they were aware, they still remained the record owners of their interest in the Pipeline Facilities even though the Coquille Bay Field operators had ceased using the pipeline in 2008. Elkins, Porter, and Munson all testified that they received disbursements of transportation fees through 2008. Elkins testified that he was aware that since 2008 the Coquille Bay Field operator had been using barges rather than the pipeline to move the oil and gas, and he agreed that the owners of the Pipeline Facilities were not entitled to transportation fees unless the operator used the pipeline facilities. As discussed above, BTL presented no evidence to support its conversion claim against Chrisjo, and it does not challenge the trial court's take-nothing judgment on all of its remaining claims.

Accordingly, we cannot conclude that the trial court abused its discretion in concluding that Chrisjo was a prevailing party under the TTLA. *See Referente*, 477 S.W.3d at 885–86.

We overrule BTL's second issue.

## C. Segregation of Fees

In its third issue, BTL argues, in the alternative, that Chrisjo did not properly segregate its attorney's fees for defending against the TTLA claim.

A prevailing party entitled to attorney's fees is required to "segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006); *Arrow Marble*, 441 S.W.3d at 709. "The need to segregate attorneys' fees is a question of law, while the extent to which claims can or cannot be segregated is a mixed question of law and fact." *Penhollow Custom Homes, L.L.C. v. Kim*, 320 S.W.3d 366, 374 (Tex. App.—El Paso 2010, no pet.). "The award of attorney's fees generally rests in the sound discretion of the trial court." *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 761 (Tex. 2012) (citing *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 881 (Tex. 1990) (per curiam)).

BTL argues that Chrisjo "failed to properly segregate recoverable from non-recoverable attorney's fees" because the affidavits and billing statements "fail to adequately segregate the fees attributable to defense of [BTL's] TTLA claims, which were based entirely on the sale of the Pipeline Facilities to Imperial in November 2010, from fees incurred in defending [BTL's] fraud, negligent misrepresentation, DTPA, Texas Securities Act, statutory stock fraud, conversion and breach of fiduciary duty claims." BTL asserts that "many of the time records

37

included in the fee affidavit pertain to claims based on misrepresentations made at the time of [BTL's] original investment and the interpretation of the PPM, which are not relevant in the least to the TTLA claims."

Chrisjo argues that it properly segregated its attorney's fees incurred in defending against the TTLA claim. When it submitted its evidence on attorney's fees to the trial court, Chrisjo was seeking attorney's fees under both the DTPA and the TTLA. Chrisjo submitted billing statements that showed only certain discrete legal services were included in its calculation of recoverable attorney's fees. Its attorney presented an affidavit in which he averred that, "[t]o the extent possible, [Chrisjo has] properly segregated recoverable from non-recoverable fees" and that Chrisjo's defense against the TTLA and DTPA claims involved the same operative facts and essentially identical analysis as its defense against the related conversion and fraud claims.

Chrisjo disagrees with BTL's argument that its TTLA claim was "based entirely on the sale of the Pipeline Facilities to Imperial in November 2010," and thus none of Chrisjo's attorney's fees incurred in addressing any theft allegations arising out the original 2004 investment were proper. We agree with Chrisjo that BTL's pleadings and the other record evidence indicate that BTL accused Chrisjo generally of theft and conversion, among other causes of action, relating to Chrisjo's conduct beginning in 2004 and continuing until 2010.

BTL further complains that Chrisjo could not reasonably claim that discrete legal services contained in the attorney's fees calculation were all necessary to address the TTLA claim. Chrisjo stated that "those discrete legal services that advance both recoverable and non-recoverable claims are so intertwined that they cannot be segregated" and that those identified legal services "were necessary for all claims (e.g., requests for disclosures, proof of facts, depositions of primary actors, and motions for summary judgment)," and so were included in its request for fees because "they are not disallowed simply because they do double service." *See Chapa*, 212 S.W.3d at 313 ("Requests for standard disclosures, proof of background facts, depositions of the primary actors, discovery motions and hearings, *voir dire* of the jury, and a host of other services may be necessary whether a claim is filed alone or with others. To the extent such services would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service."). However, the court in *Chapa* stated that while attorneys do not "have to keep separate time records" when they draft petitions or provide other services that advance both recoverable and nonrecoverable claims, it is still appropriate to provide "an opinion . . . that, for example, 95 percent of their drafting time would have been necessary even if there had been no [nonrecoverable] claim." *Id.* at 314. Chrisjo provided no such evidence regarding the percentage of its attorney's work that would have been necessary for certain

39

discrete legal services even if no nonrecoverable claims had been advanced, arguing instead that all of those remaining services would have been necessary to address the recoverable claims.

However, BTL's argument that Chrisjo failed to identify the percentage of those discrete legal services that were attributable solely to the TTLA claim ignores the role of the trial court as a fact finder here and the standard of review for evaluation of the sufficiency of the evidence. *See id.* ("But when, as here, it cannot be denied that at least some of the attorney's fees are attributable only to claims for which fees are not recoverable, segregation of fees ought to be required and the jury ought to decide the rest."); *Kim*, 320 S.W.3d at 374 (holding that extent to which claims can or cannot be segregated is mixed question of law and fact); *see also El Apple*, 370 S.W.3d at 763–64 (holding that evidence is sufficient to support amount of attorney's fees awarded when claimant presented evidence of services performed, who performed them and at what hourly rate, when they were preformed, and how much time work required). The appropriate question here is whether the evidence was sufficient to support the trial court's award of $24,829.42 as TTLA attorney's fees.

Chrisjo did segregate its attorney's fees by eliminating from its claim the fees attributable to services rendered on nonrecoverable claims, and it sought $52,353.95, based on its attorney's affidavit that the remaining services were

essentially all necessary to defend against the TTLA and DTPA claims. The trial court considered this evidence—including detailed, itemized billing statements that set out the exact tasks performed, the people who performed the tasks and their hourly rates, and the amount of time involved—and, after determining that Chrisjo was not entitled to any fees under the DTPA because of the stricken supplemental pleading, awarded Chrisjo less than half of the fees its sought, or $24,829.42. Thus, the trial court impliedly found not credible the attorney's testimony that "those discrete legal services that advance both recoverable and non-recoverable claims are so intertwined that they cannot be segregated," and awarded less than the full requested amount of fees. *See El Apple*, 370 S.W.3d at 763–64; *see also Messier v. Messier*, 458 S.W.3d 155, 166–67 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (holding that, in determining amount of attorney's fees, trial court "can consider the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties").

Accordingly, we conclude that Chrisjo presented segregated evidence of its attorney's fees, and the trial court did not abuse its discretion in considering the record and determining the amount of the award here. *El Apple*, 370 S.W.3d 763–64; *Messier*, 458 S.W.3d at 166–67.

We overrule BTL's third issue on appeal.

41

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Brown, and Huddle.